1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   AUTOTEK, INC. and CHRISTOPHER              No.  2:16-cv-01093-KJM-CKD
     LULL,
12
                    Plaintiffs,
13                                              ORDER
            v.
14
     COUNTY OF SACRAMENTO, et al.,
15
                    Defendants.
16

17

18              Several motions are before the court.  Plaintiffs Autotek, Inc. and Christopher Lull

19   (collectively "plaintiffs") move for relief from the court's prior order, Mot. for Relief, ECF No.

20   68-1, and move to amend their complaint, Mot. to Am., ECF No. 69-1.  Defendants County of

21   Sacramento, Lori Moss Hunt, Leighann Moffitt, Brian Washko, Robin Rasmussen, Bob Ivie,

22   John Muzinich, Scott Purvis, Russ Williams, Wayne Eastman, June Powells-Mays, Tammy

23   Derby, Paul Munoz and Jared Wickliff (collectively "County defendants" or "the County") move

24   for summary judgment, County MSJ, ECF No. 66-1, as does defendant Sacramento Municipal

25   Utility District ("SMUD"), SMUD MSJ, ECF No. 70-1.  On November 2, 2018, the court heard

26   oral argument on the motions.  Counsel Cris Vaughan and Khushpreet Mehton appeared for

27   plaintiffs; counsel Wendy Motooka appeared for County defendants and Susan DeNardo and

28   Julio Colomba appeared for SMUD.   For the reasons set forth below, the court DENIES

                                             1

1  plaintiffs' motion for relief and motion to amend, and GRANTS County defendants' and

2  SMUD's motions for summary judgment.

3  I.      BACKGROUND

4          A.      The Parties

5                  Plaintiffs sue various County employees, along with the County of Sacramento

6  itself.  The named employees are as follows: County defendants in the Code Enforcement ("CE")

7  division are Supervising Officer Jared Wickliff, Manager Tammy Derby and Senior CE Officer

8  Paul Munoz.  Wickliff Decl. ¶ 6, ECF No. 66-4.  Leighann Moffitt acts as Director of the County

9  Planning Services division.  County's Undisputed Material Fact ("CUMF")[1] 65, ECF No. 74-2.

10  Building Permits and Inspection ("BPI") management and staff include Chief Building Official

11  Brian Washko, Violations Supervisor Robin Rasmussen, Principal Building Inspector Russ

12  Williams, Supervising Building Inspector Bob Ivie and Building Inspectors John Muzinich, Scott

13  Purvis and Wayne Eastman.  Rasmussen Decl. ¶¶ 1, 34, ECF No. 66-5.  Lori Moss serves as

14  Director of the Department of Community Development, which oversees CE, BPI, and Planning.

15  CUMF 67.  Finally, June Powells-Mays is the Supervising Deputy County Counsel and legal

16  counsel to BPI and CE.  Powells-Mays Decl. ¶¶ 1–2, ECF No. 66-6.

17                  Plaintiffs also file suit against SMUD.  Second Am. Compl. ("SAC") ¶ 4, ECF No.

18  35.

19          B.      Factual History

20                  1.      Facts Related to County Defendants

21                  Christopher Lull is the owner and operator of Autotek, a California Corporation,

22  operating at 8633 Antelope North Road, Antelope, California 95843 ("the property").  SAC ¶ 1.

23  Autotek is a combined smog check and auto repair station.  *Id.* ¶ 2.  To conduct his operations,

24  Lull leased a portion of the property from owner and landlord, Michael Urbancic.  CUMF 24, 26.

25  _____

26          [1] The court identifies and treats as undisputed only those facts the parties have mutually
    identified as undisputed, as confirmed in plaintiffs' opposition to the County defendants'
27  statement of undisputed material facts, ECF No. 74-1, and opposition to SMUD's statement of
    undisputed material facts, ECF No. 75-3.  For disputed facts, the court cites to the original source
28  and resolves disputed evidentiary issues only where necessary.

In May 2010, Lull began making unpermitted repairs to his leased portion of the property. CUMF 24, 25.  On December 13, 2010, Urbancic complained to the County Building Permits and Inspection ("BPI") division about the unpermitted work.  CUMF 26.  On December 16, 2010, BPI inspected the property and issued a violation notice and stop work order against Lull.  CUMF 27. On February 3, 2011, based on the violation notice, BPI recorded a Notice of Pending Enforcement Action ("NOPEA") against the property (hereinafter "the BPI NOPEA").  CUMF 29.

Prior to Urbancic's complaining to BPI, Lull on November 15, 2010, had complained to the County of Sacramento about junk and debris accumulating on Urbancic's side of the property.  CUMF 1.  On January 5, 2011, the County responded by dispatching CE to inspect.  CUMF 3.  CE observed various zoning code violations and issued a "Notice of Violation" to Urbancic.  CUMF 3, 4.  The violation notice identified the problem areas and the corrective action necessary to bring the property into compliance.  CUMF 4.  Generally, when a CE violation case is initiated against a property, it remains open until the violation is corrected. CUMF 5.  Nothing in the record before the court suggests the initial code violation against the property has been corrected.  CUMF 6.  On December 7, 2011, CE recorded the active violation by filing a NOPEA against the property (hereinafter "the CE NOPEA").  CUMF 7.

Meanwhile on September 17, 2010, Lull had initiated a lawsuit against Urbancic regarding improvements to the property parking lot.[2]  To resolve the dispute, the parties reached a settlement whereby Lull agreed to purchase the property and Urbancic would pay Lull a sum of $175,000.  Motooka Decl., Ex. C, Lull Dep. 43:1–7, ECF No. 66-3.  During the purchase process, Lull's title company informed him that two outstanding NOPEAs against the property were clouding title.  CUMF 8.  On January 30, 2014, because the NOPEAs were impeding completion of the sale and fulfillment of the settlement agreement, Lull contacted Chief Building Official Brian Washko and offered to take responsibility for correcting the code violations if the County

---

[2] The court takes judicial notice of this case, titled *Lull v. Urbancic*, Sacramento Superior Court Case No. 34-2010-00087710.  *See Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (the court "may take judicial notice of undisputed matters of public record, . . . including documents on file in federal or state courts." (citations omitted)).

agreed to lift the NOPEAs to allow the sale to finalize.  CUMF 9, 10.  County Counsel June Powells-Mays reviewed and accepted Lull's offer on behalf of the County, and the terms of the agreement were memorialized in a Covenant and Forbearance Agreement to Abate Violations ("Covenant").  CUMF 11.  The terms of the Covenant were these: The County agreed to temporarily lift the NOPEAs and Lull agreed to correct the outstanding violations, make various improvements in compliance with the building code and deposit a $20,000 performance bond as collateral.  CUMF 11.  Lull reviewed and signed the Covenant.  CUMF 12.  The County lifted the NOPEAs and Lull's purchase of the property was completed in February 2014.  CUMF 14.

Just a few weeks later, on March 3, 2014, Lull met with CE officials Tammy Derby and Jared Wickliff in an attempt to challenge the validity of the Covenant or, alternatively, to modify its terms.  CUMF 16, 17, 31.  Lull did not succeed in this attempt, however, because individual County employees lacked the authority to modify the Covenant; modification instead required the concurrence of all interested County divisions and County Counsel.  CUMF 18.  Lull ultimately did not comply with the Covenant's terms, including the County's development standards; he County imposed administrative penalties on December 16, 2014, and January 22, 2015, as a result.  CUMF 19.  Lull challenged these penalties in an Administrative Penalty Review Hearing in which the County prevailed, which was followed by a *de novo* short cause trial in Sacramento Superior Court, Case No. 34-2015-00177665, resulting in a judgment in the County's favor on April 19, 2018.  CUMF 20.  In deciding for the County, the state court found that violations existed, and Lull received notice of this decision and opportunity to correct those violations yet failed to do so.  CUMF 22.

a)      Additional Violations

In March 2012, with the above referenced NOPEAs pending against the property at that point, and while still leasing the property from Urbancic, Lull obtained a permit ("Permit 134") to address the unpermitted construction subject to the BPI NOPEA.  CUMF 32.  This permit required installation of a separate electrical meter for the smog shop suite.  CUMF 33.  In April 2013, the permit expired due to inactivity, which prompted BPI to issue a notice of continuing violation in December 2013.  CUMF 34.  BPI referred enforcement of the violation to

County Counsel Powells-Mays.  CUMF 35.  On January 15, 2014, before pursuing injunctive remedies, Powells-Mays sent a letter to Lull and Urbancic granting them an additional thirty days to bring the property into compliance.  CUMF 37.  Lull reactivated Permit 134 in March 2014, but once again allowed it to expire in September 2017 because Lull never obtained the required final inspections and certification.  CUMF 38.

In March 2014, Lull also applied for and received a separate permit ("Permit 195"), this time for various improvements on the north side of the property.  CUMF 39.  This permit also expired due to inactivity in October 2014.  CUMF 41.  In December 2014, without a permit, Lull began demolition and improvements to the north side of the property.  CUMF 42–46. On December 8 and 10, 2014, BPI issued stop orders for the unpermitted work.  CUMF 47.  Lull failed to comply.  On December 15, 2014, BPI issued two administrative penalty notices in response.  CUMF 48, 49.  BPI Violations Supervisor Robin Rasmussen also referred the unpermitted work to the Sacramento Metropolitan Air Quality Management District and State Contractor's Licensing Board.  Rasmussen Decl. ¶ 23, ECF No. 66-5; Vaughan Decl., Ex. A, Rasmussen Dep. 120:11–21, ECF No. 74-3.

On December 17, 2014, in an effort to aid Lull in achieving compliance, Rasmussen reactivated Permit 134.  CUMF 50.  Five days later, on December 22, 2014, BPI issued another stop order, which Lull recognized as a stop order, yet continued the work anyway. CUMF 51, 52.  On December 23, 2014, BPI posted a "Notice and Order of the Building Official – Disconnection of Electrical Service," accompanied by an additional stop order.  CUMF 53.  On December 24, 2014, SMUD disconnected electrical service to the property (as discussed below), and another stop order was issued, and the property posted as unsafe.  CUMF 54. Notwithstanding the stop orders and postings, Lull continued to build.  CUMF 55.

b)      Post-Disconnection Developments

In February 2015, a new permit ("Permit 018") was assigned[3] to Lull to address the unpermitted construction.  CUMF 56.  To assist Lull, BPI credited $1,705, the amount he paid for Permit 195, toward Permit 018.  CUMF 57.  As of the time of the parties' filings, however, Permit 018 had yet to be issued because Lull had not paid $8,355 in unpaid fees for his past violations.  CUMF 58.  BPI's enforcement action against the property remained open.  CUMF 63. On May 26, 2015, the County sent a letter to Lull warning him that it might revoke Autotek's business license for continued non-compliance; based on the record before the court, the County had not revoked the license.  Lull Dep. 169:18–22.

2.      Facts Related to SMUD

On December 23, 2014, Lull received a notice, hand-delivered by Rasmussen, that his continued noncompliance had resulted in the issuance of an order by the County for disconnection of his electricity.  SMUD's Undisputed Material Fact ("SMUF") 18, ECF No. 75-3; Lull Dep. 119:5–14.  The morning of December 24, 2014, SMUD employee Mike Wolff received a call from the Sacramento County BPI Office requesting assistance with disconnecting utility service at the property.  SUMF 1.  Later that morning, Wolff met Rasmussen at the property to effectuate the disconnection.  SUMF 2.  While there, Rasmussen posted a notice that the premises was unsafe for occupancy.  Wolff Decl. ¶ 5, ECF No. 70-3; Lull SMUD Decl. ¶ 9, ECF No. 75-2.  Rasmussen informed Wolff the property owner/occupant had failed to comply with numerous BPI notices and orders and continued to carry out unpermitted construction on the property.  SUMF 4.  Because the County deemed the property unsafe for occupancy, Wolff terminated electrical service to the premises by disconnecting the meter.  SUMF 6.  Wolff determined the meter panel itself was not in a hazardous condition; such a determination reflects the extent of SMUD's expertise regarding safety with respect to the property.  SUMF 6.

---

[3] As described in Rasmussen's declaration, a permit is "assigned" when it has been approved but awaits payment of permitting fees by the permittee.  *See* Rasmussen Decl. ¶ 31. Once permitting fees are paid, the permit becomes "issued" and ready for use.  *Id.*

3.  Facts Related to Plaintiffs' Criticism of County Enforcement

As the above events unfolded, plaintiffs contend they[4] criticized the County's regulatory and enforcement actions at every turn.  *See generally* Pls.' Statement of Undisputed Material Facts ("PUMF"), ECF No. 74-2.  For instance, in December 2010, plaintiffs criticized the County permit and electrical policies as implemented by an unidentified employee who denied Lull's ministerial permit request.  PUMF 9.  On January 3, 2011, plaintiffs again criticized County officials for their enforcement of County regulations.  PUMF 12.  On January 10, 2011, plaintiffs again chided "County Building Officials' use and enforcement of internal policies that did not reflect applicable State Building Codes."  PUMF 16.

On September 26, 2011, plaintiffs continued to criticize County officials, but this time "warned several county employees that [Lull] was going to petition the Court to restrain their attempts to disconnect his electricity."  PUMF 20.  The criticism continued on December 14, 2011, PUMF 23 (criticizing County officials in their public office); January 29, 2014, PUMF 25–26 (criticizing Tammy Derby, Brian Washko and Robin Rasmussen); February 1, 2014, PUMF 28 (criticizing Powells-Mays "for governing via contract and strong arming him into signing the Covenant"); March 3, 2014, PUMF 31 (criticizing Derby and Munoz); December 5, 2014, PUMF 36 (calling Rasmussen "an idiot"); and December 15, 2014, PUMF 37 (criticizing Rasmussen and Washko).

Specific examples of plaintiffs' criticism they say qualifies as protected expression include statements such as: Asking Derby, "does your strong-arm tactics [sic] work with everyone, or just people that don't know any better[?]," PUMF 25; and asking Derby and Munoz, "why do you keep looking and pointing at the Contract when I ask you to point to the law that authorizes your impositions? [Y]our Contract is nothing more than toilet paper, show me a law or sue me."  PUMF 31.  Plaintiffs allege County defendants retaliated against them in response to these criticisms by wrongfully terminating electrical service to the property.

---

[44] In attributing the protected expression, plaintiffs use Lull and plaintiffs interchangeably and so the court follows that convention.

C.      Procedural History

Plaintiffs initiated this action on May 20, 2016.  Compl., ECF No. 1.  The original complaint alleged eleven counts of various constitutional and state tort violations.  *Id.*  On July 25, 2017, the court dismissed several County defendants as duplicative, dismissed multiple claims and abstained from hearing the first, second, third, fourth and seventh claims under the *Pullman* abstention doctrine.  First Dismissal Order, ECF No. 31.  On September 8, 2017, plaintiffs amended their complaint and once again the court dismissed multiple claims, leaving only a retaliation claim against certain individual county defendants, *Monell* claims against the County and a procedural due process claim against SMUD, Second Dismissal Order, ECF No. 57.  Plaintiffs now move for relief from the court's second dismissal order.  Mot. for Relief.  SMUD opposes the motion, SMUD Relief Opp'n, ECF No. 73, and plaintiffs have replied, Relief Reply, ECF No. 80.  Plaintiffs also move to amend their complaint for a third time.  Mot. to Am.  County defendants oppose this motion, County Opp'n to Mot. to Am., ECF No. 71, as does SMUD, SMUD Opp'n to Mot. to Am., ECF No. 72; plaintiffs have replied, Reply to Mot. to Am., ECF No. 81.

County defendants also move for summary judgment on the retaliation claim and *Monell* claim.  County MSJ.  Plaintiffs oppose their motion, Opp'n to County MSJ, ECF No. 74, and County defendants have replied, Reply to County MSJ, ECF No. 79.  SMUD also moves for summary judgment on the remaining procedural due process claim against it.  SMUD MSJ.  Plaintiffs have opposed, Opp'n to SMUD MSJ, ECF No. 75, and SMUD has filed a reply, Reply to SMUD MSJ, ECF No. 78.  The court resolves the motions here.

II.      DISCUSSION

A.      Plaintiffs' Motion for Relief

Plaintiffs move for relief under Federal Rule of Civil Procedure 60(b) from the court's dismissal of plaintiffs' Fourth Amendment unlawful search and seizure claim against SMUD.  Mot. for Relief.  While plaintiffs' motion initially focused on Rule 60(b)(3), grounded on fraud, misrepresentation or misconduct by an opposing party, they have since abandoned that argument.  *See* Relief Reply at 2, ECF No. 80 ("Plaintiffs withdraw their claims of fraud,

1   misrepresentation, and/or misconduct.").  Plaintiffs continue, however, to seek relief under a

2   mistake of law theory, as appropriate under Rule 60(b)(1), claiming the court erred by relying on

3   SMUD's purported authority to enforce the Sacramento County Code ("county code") and the

4   California Building Code ("CBC") when it disconnected electrical service to plaintiffs' property.

5   *Id*. at 3–4.

6            Under Rule 60(b)(1), the court may relieve a party from a prior order based on

7   mistake, inadvertence, surprise or excusable neglect. Fed. R. Civ. P. 60(b)(1); *see also Glavor v.*

8   *Shearson Lehman Hutton, Inc.*, 879 F. Supp. 1028, 1032 (N.D. Cal. 1994) ("District Courts are

9   authorized to reconsider interlocutory orders at any time prior to final judgment."), *aff'd*, 89 F.3d

10  845 (9th Cir. 1996).  Within the category of mistake, Rule 60(b)(1) also permits relief due to

11  court error, and where court error is alleged, as here, the mistake must be obvious; that is, a

12  fundamental misconception of the law will not suffice.  11 C. Wright & A. Miller, *Federal*

13  *Practice and Procedure* § 2858.1 (3d ed. 2020); *Smith v. Evans,* 853 F.2d 155, 158 (3d Cir. 1988)

14  ("[L]egal error, without more, cannot justify granting a Rule 60(b) motion.").  Moreover,

15  reconsideration based on court error requires that the moving party present "facts or law of a

16  strongly convincing nature," as merely recapitulating arguments the party previously made will

17  not "induce the [c]ourt to reverse its prior decision."  *Glavor*, 879 F. Supp. at 1032 (citing

18  *Backlund v. Barnhart*, 778 F.2d 1386, 1388 (9th Cir. 1985)).  Any argument presented for the

19  first time on reconsideration is deemed waived unless justification exists for omitting the

20  argument when the party initially had the opportunity to do so.  *Id.* (citing *Publishers Resource,*

21  *Inc. v. Walker–Davis Publications, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985)).

22           Here, plaintiffs do not meet their heavy burden of demonstrating the court

23  committed a mistake of law in dismissing their Fourth Amendment unlawful search and seizure

24  claim against SMUD.  Plaintiffs argue SMUD lacked the authority to disconnect service under the

25  CBC or the county code.  Relief Reply at 3–4.  Based on this argument, plaintiffs believe the

26  court erred by relying on SMUD's purported authority to act under either set of regulatory

27  provisions when dismissing the claim.  *Id.* at 4.  Plaintiffs did not present this position in their

28  allegations in the second amended complaint, *see generally* SAC, or in their opposition to

1    SMUD's motion to dismiss, *see* ECF No. 48 at 2 (citing only allegations that SMUD acted

2    beyond the authority provided by its own protocol, SMUD Rule 11).  Plaintiffs' new arguments,

3    therefore, are waived.  *See United States v. $998,830.00 in U.S. Currency*, No. 2:09-CV-0086-

4    KJD-GWF, 2011 WL 830952, at *2 (D. Nev. Mar. 4, 2011) ("It is not an abuse of discretion for a

5    district court to decline to address an issue raised for the first time in a motion for

6    reconsideration.").

7            Plaintiffs contend their arguments were presented to the court previously through

8    their objection to SMUD's request for judicial notice, submitted with their opposition to SMUD's

9    motion to dismiss.  *See* ECF 48-1 at 2.  Assuming without deciding that plaintiffs' contention

10   fairly characterizes the record, plaintiffs' arguments now are recast and provide no justification

11   for relief.  In support of its motion to dismiss, ECF No. 47, SMUD asked the court to take judicial

12   notice of "California Building Code 112.3."  ECF No 47-3 at 2, 8.  Plaintiffs made the objection

13   to which they now point, claiming the purported building code was actually "a Sacramento

14   County code section."  ECF No. 48-1 at 2.  The court overruled plaintiffs' objection, explaining:

15   "The Sacramento County Code adopts and incorporates by reference the California Building

16   Code.  *See* Tit. 16, Sac. County Code, Ch. 16.02.040 'Adoption of the California Building Code'

17   (2013)."  Second Dismissal Order at 9 n.3.  Thus, the court expressly acknowledged the

18   distinction between the county code and the CBC, found that the CBC had been adopted by

19   reference into the county code and concluded that SMUD terminated plaintiffs' electrical service

20   under the authority of a presumptively valid ordinance.  *Id.* at 9.

21           The court also explained that plaintiffs' allegations, that SMUD acted beyond its

22   authority, are relevant only to plaintiffs' procedural due process claim, not their unreasonable

23   search and seizure claim, because seizures made under the purported authority of a local

24   ordinance carry a presumption of reasonableness.  *Id.* (citing *Heien v. North Carolina*, 135 S. Ct.

25   530, 546 (2014); *Wyss v. City of Hoquiam*, 111 F. App'x 449, 451 (9th Cir. 2004); *Price v. City of

26   Junction, Tex.*, 711 F.2d 582, 588 (5th Cir. 1983)).  Plaintiffs do not argue the CBC or county

27   code is invalid; rather, they contend SMUD acted beyond any authority granted by either

28   ordinance.  Relief Reply at 3–4.  To the extent plaintiffs are merely repackaging arguments, the

1    substance of which already was considered by the court, they provide no basis for the court to

2    alter its prior order under Rule 60(b)(1). *See Glavor*, 879 F. Supp. at 1032.

3             Finally, plaintiffs' delay of nearly eight months in moving for reconsideration,

4    with no explanation for the delay, weighs against granting the motion.  Rule 60(c)(1) sets a time

5    limit on the filing of a Rule 60(b) motion: "A motion under Rule 60(b) must be made within a

6    reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the

7    judgment or order or the date of proceeding." Fed. R. Civ. P. 60(c)(1).  Even if a Rule 60(b)(1)

8    motion is filed within one year of the disputed order, as here, the motion is not presumptively

9    reasonable. *Meadows v. Dominican Republic*, 817 F.2d 517, 520–21 (9th Cir. 1987).  The court

10   must determine the reasonableness of the filing by considering "the facts of [the] case, [and]

11   taking into consideration the interest in finality, the reason for delay, the practical ability of the

12   litigant to learn earlier of the grounds relied upon, and prejudice to other parties." *Ashford v.*

13   *Steuart*, 657 F.2d 1053, 1055 (9th Cir. 1981) (per curiam).

14           All of these factors weigh in favor of denying plaintiffs' motion.  In reply,

15   plaintiffs give no explanation for waiting until October 4, 2018, to file their motion; they merely

16   claim they will suffer the greatest prejudice if the motion is denied, due to the continued

17   deprivation of electrical service.  Relief Reply at 3.  Their prejudice argument miscomprehends

18   the fourth *Ashford* factor, which requires the court to evaluate prejudice potentially suffered by

19   parties other than the moving party, not the prejudice the moving party may suffer if the motion is

20   denied. *See Woodfin Suite Hotels, LLC v. City of Emeryville*, No. C 07-1719SBA, 2008 WL

21   724105, at *10 (N.D. Cal. Mar. 14, 2008) (considering prejudice not only to non-movants, but

22   also to other parties in related state and administrative actions, in denying Rule 60(b)(1) motion).

23   Any prejudice potentially suffered by plaintiffs does not factor into the court's calculus, and

24   plaintiffs do not argue the non-moving parties will not suffer prejudice if the motion is granted.

25   In fact, as captured in the discussion below, the non-moving party affected here would be

26   prejudiced if the court were to grant the motion.

27           The remaining factors also favor SMUD's position.  Plaintiffs not only waited the

28   eight months before attempting to revive their Fourth Amendment claim, providing no

1    justification for their delay; they filed their motion exactly one day prior to SMUD's filing its

2    motion for summary judgment to ensure compliance with the case scheduling order.  The finality

3    factor favors denial because the parties, particularly SMUD, had a reasonable expectation for

4    eight months that the case would progress absent plaintiffs' Fourth Amendment claim.  The other

5    factors, reason for delay and ability to learn the grounds relied upon, favor denial because

6    plaintiffs give no explanation for their delay and the court's reasons for dismissing the Fourth

7    Amendment claim have been readily available since its order issued.  For these reasons,

8    plaintiffs' motion is untimely.

9            Plaintiffs' motion for relief is DENIED.

10       B.    Motions for Summary Judgment

11           1.    Legal Standard

12           A court will grant summary judgment "if . . . there is no genuine dispute as to any

13   material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

14   The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

15   resolved only by a finder of fact because they may reasonably be resolved in favor of either

16   party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

17           The moving party bears the initial burden of showing the district court "there is an

18   absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S.

19   317, 325 (1986).  Then the burden shifts to the non-movant to show "there is a genuine issue of

20   material fact . . . ."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).

21   In carrying their burdens, both parties must "cit[e] to particular parts of materials in the

22   record  . . .; or show [] that the materials cited do not establish the absence or presence of a

23   genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

24   Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the non-movant] must do more

25   than simply show that there is some metaphysical doubt as to the material facts").  "Only disputes

26   over facts that might affect the outcome of the suit under the governing law will properly

27   preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 247–48.

28

1    In deciding summary judgment, the court draws all inferences and views all

2  evidence in the light most favorable to the non-movant.  *Matsushita*, 475 U.S. at 587–88.  "Where

3  the record taken as a whole could not lead a rational trier of fact to find for the [non-movant],

4  there is no 'genuine issue for trial.'"  *Id.* at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv.

5  Co.*, 391 U.S. 253, 289 (1968)).  District courts should act "with caution in granting summary

6  judgment," and have authority to "deny summary judgment in a case where there is reason to

7  believe the better course would be to proceed to a full trial."  *Anderson*, 477 U.S. at 255.  A trial

8  may be necessary "if the judge has doubt as to the wisdom of terminating the case before trial,"

9  *Gen. Signal Corp. v. MCI Telecomms. Corp.*, 66 F.3d 1500, 1507 (9th Cir. 1995) (quoting *Black

10  v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994)), "even in the absence of a factual dispute[,]"

11  *Rheumatology Diagnostics Lab., Inc v. Aetna, Inc.*, No. 12-05847, 2015 WL 3826713, at *4 (N.D.

12  Cal. June 19, 2015) (quoting *Black*, 22 F.3d at 572).

13    2.    County Defendants' Motion for Summary Judgment

14    The County defendants move for summary judgment on the sole remaining claim

15  against them: Violation of 42 U.S.C. § 1983 for retaliation based on the exercise of plaintiffs'

16  First Amendment rights.  For the reasons set forth below, the County defendants' motion is

17  GRANTED.

18    a)    First Amendment Retaliation

19    To bring a claim for First Amendment retaliation under § 1983, plaintiffs must

20  show: (1) they engaged in constitutionally protected activity; (2) as a result, they were subjected

21  to adverse action by defendants that would chill a person of ordinary firmness from continuing to

22  engage in the protected activity; and (3) there was a substantial causal relationship between the

23  constitutionally protected activity and the adverse action.  *Blair v. Bethel Sch. Dist.*, 608 F.3d

24  540, 543 (9th Cir. 2010).  Where retaliatory prosecution is alleged, plaintiffs must also show the

25  absence of probable cause.  *Hartman v. Moore*, 547 U.S. 250, 265–66 (2006).  If no reasonable

26  juror could find a question of fact exists with respect to any of the required elements, summary

27  judgment must be entered in favor of the County defendants.

28

b)    Constitutionally Protected Activity

It is well settled that criticism of governmental bureaucracy, at any level, is a form of speech protected by the First Amendment. *See*, *e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 276 (1964) ("restraint [] imposed upon criticism of government and public officials, [is] inconsistent with the First Amendment."). Here, County defendants make no claim, nor could they, that Lull was not exercising his First Amendment rights by actively, and at times aggressively, criticizing them for their treatment of his business and property. *See* SAC ¶¶ 43, 44, 49, 55, 58, 62, 66, 67. The first element of plaintiffs' First Amendment retaliation claim is satisfied.

c)    Chill a Person of Ordinary Firmness from Engaging in Protected Activity

County defendants need not actually have prevented plaintiffs from engaging in the constitutionally protected activity, they need only to have "*intended* to interfere with [plaintiffs'] First Amendment rights." *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (emphasis in original). Intent is established through direct or circumstantial evidence. *Id.* at 1300–01. However, because direct evidence of intent to violate a party's First Amendment rights is rarely available, circumstantial evidence must almost always be used. *Id.* at 1302. Further, "[q]uestions involving a person's state of mind . . . are generally factual issues inappropriate for resolution by summary judgment." *Id.* (quoting *Braxton–Secret v. Robins Co.*, 769 F.2d 528, 531 (9th Cir.1985)) (alteration in original).

i.    County Defendants' Arguments

Here, County defendants argue that named personnel from various departments had no intention of chilling plaintiffs' First Amendment rights, and there is no evidence to the contrary. As an initial matter, the County defendants did not initiate an action against Lull or the property on their own initiative. Rather, CE defendants first inspected the property based on Lull's own complaints regarding debris on Urbancic's side of the property. CUMF 1, 2. That inspection resulted in a violation notice against Urbancic and the County's recording of a NOPEA

14

against the property on December 7, 2011.  CUMF 3, 4, 7.  This NOPEA, the County argues,

does not establish retaliatory intent against Lull because he was not actually aware of the NOPEA

until he attempted to purchase the property.  CUMF 8.  Once Lull became aware of the NOPEA's

existence, the County agreed to assist his attempted purchase of the property by entering into a

Covenant under which the County would temporarily lift the NOPEA and Lull agreed to correct

the outstanding violations against the property.  CUMF 8–11.  Only after the corrections Lull had

promised were not made, did the County levy administrative penalties.  CUMF 19.

The same is true, the County argues, as to defendants in the BPI division.  County

MSJ at 16–21.  It was Urbancic who called for BPI's inspection of the property based on his

complaint of unpermitted construction on Lull's side of the property.  CUMF 24–26.  This

inspection revealed several code violations, which led the County to issue a violation notice, stop

work order and then to record an additional NOPEA.  CUMF 27–29.  Again, Lull was unaware of

this NOPEA until he attempted to purchase the property.  CUMF 8.  Lull then failed to comply

with the Covenant's terms, stop orders and violation notices; he did not pay outstanding

administrative penalties; and after the expiration of several work permits, Lull continued to

conduct unpermitted construction on certain portions of the property.  Then and only then did the

County arrange for disconnection of electrical service to the property.  CUMF 30, 31, 32, 34, 38,

39, 41–49, 51–54.  In other words, with each step in the process, even as violations and penalties

mounted, the County argues it clearly notified Lull of his violation conduct and provided him

multiple opportunities to bring his property into compliance in a fair and equitable manner.  Only

after these attempts failed, a number of times, did the County then terminate electrical service.

Likewise, County defendants argue that the actions of County Counsel June

Powells-Mays were not intended to chill plaintiffs' First Amendment rights.  To the contrary,

Powells-Mays played an active role in drafting the Covenant designed to aid Lull in purchasing

the property and even delayed enforcement of the collateral bond by more than a year after the

Covenant was executed.  All the while, Lull continued to incur additional violations.  County

MSJ at 22–24; CUMF 8–13, 39, 41–52, 76.

County defendants also maintain Lori Moss, Director of the Department of Community Development, cannot be held liable because she had no personal involvement in any of the alleged retaliatory behavior by County departments.  County MSJ at 21 (citing *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them.  There is no respondeat superior liability under section 1983.")).

ii.     Plaintiffs' Arguments

In response, plaintiffs argue "[i]t is no mere coincidence . . . that as Plaintiffs continued to exercise their First Amendment right to criticize the County and its employees, the County responded with escalating acts of retaliation which culminated in the disconnection of their electrical service."  Opp'n to County MSJ at 10.  As plaintiffs began to accumulate more violations, County defendants intensified their response, causing plaintiffs to chide defendants further, perpetuating a cycle of critique and retaliatory enforcement actions in response.  *Id.* (citing, e.g., PUF 9 (criticizing County employee for denying ministerial permit request), 12 (criticizing County and Building Official employees), 16 (criticizing Building Officials use and enforcement of internal policies)).  The County defendants' ultimate response of disconnecting the electricity required to operate Lull's business is precisely the kind of heavy-handed action, plaintiffs argue, that is "enough to deter an ordinary person from continuing to exercise their First Amendment right to criticize and speak out against the County and its employees lest they face additional retaliation."  *Id.*

iii.    Analysis

(a)     Rasmussen and Washko

As explained below, plaintiffs present sufficient evidence to raise a disputed question of material fact with respect to whether defendants Rasmussen and Washko intended to hinder the exercise of plaintiffs' First Amendment rights.  A Public Records Act request revealed an email in which Rasmussen stated that disconnecting electrical services would "get [Lull's] attention and bring him to his senses."  Lull County Decl. ¶ 37, Ex. A, ECF No. 74-4.

16

1    Additionally, Rasmussen issued two administrative penalties on December 15, 2014, one for

2    unpermitted conversion of property space, the other coded as an "imminent health & safety

3    hazard," the latter of which purportedly shortens the appeal period from ten to four days.

4    Vaughan Decl, Ex. A, Rasmussen Dep., Ex. 11, 12, ECF No. 74-3.  Rasmussen testified at

5    deposition that classifying a violation notice as an "imminent health & safety hazard" is atypical.

6    Rasmussen Dep. at 94:1–18.  Here, Rasmussen used the "imminent health & safety hazard"

7    classification at Washko's direction.  *Id.* at 92:8–11.

8             Additionally, Rasmussen reported plaintiffs to the Sacramento Air Quality

9    Management Department and the State Contractor's Licensing Board for investigation.

10   Rasmussen Dep. at 120:4–18.  And Craig Rowland, plaintiff's engineer, testified  the County

11   rejected Lull's completed remedial plans, which was a rare occurrence.  Vaughan Decl., Ex. A,

12   Rowland Dep. at 81:3–19.[5]

13            The County defendants argue correctly that Rasmussen and Washko cannot be

14   held liable for referring the property to the Sacramento Air Quality Management Department and

15   the State Contractor's Licensing Board under the *Noerr-Pennington* doctrine.[6]  *See Manistee*

16

17            [5] Plaintiffs also produce, for the first time, a sworn declaration from Jack Nichols, a
18   former supervisor of Rasmussen's in the Complaints and Violation Section within the Sacramento
     County Building Department.  Nichols Decl., ECF No. 74-5.  Plaintiffs did not disclose Nichols
19   as a possible witness during discovery as required by Federal Rule of Civil Procedure 26(a).
     County defendants object to the court's consideration of his declaration on those grounds.
20   County's Obj. to Pls.' Evid., ECF No. 79-1.  Because plaintiffs failed to comply with Rule 26(a),
     and provide no explanation for their tardiness, the court disregards Nichols' declaration in its
21   entirety.  *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness
     as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to
22   supply evidence on a motion . . . unless the failure was substantially justified or is harmless.");
     *Elliott v. Google, Inc.*, 860 F.3d 1151, 1161 (9th Cir. 2017) (affirming district court's exclusion of
23   evidence not disclosed during discovery).

24            [6] "Under the *Noerr–Pennington* doctrine, those who petition any department of the
     government for redress are generally immune from statutory liability for their petitioning
25   conduct."  *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006).  The doctrine originally
     emerged in the antitrust context from the leading cases *E. R.R. Presidents Conference v. Noerr*
26   *Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657,
     85 S.Ct. 1585 (1965); however, the doctrine has since been expanded and "'appl[ied] with full
27   force in other statutory contexts' outside antitrust."  *Kearney v. Foley & Lardner, LLP*, 590 F.3d
     638, 644 (9th Cir. 2009) (quoting *Sosa*, 437 F.3d at 930).

28

1   *Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1094 (9th Cir. 2000) (finding unpersuasive

2   petitioner's argument that "petitioning by government officials should be excluded from *Noerr-*

3   *Pennington* immunity"); *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 644–45 (9th Cir. 2009)

4   (noting *Noerr-Pennington* doctrine may apply to government entities).  However, the referrals to

5   the other agencies here still are pertinent, as they support a collective inference that the County

6   defendants acted with the intent to hinder plaintiffs' First Amendment rights, and the *Noerr-*

7   *Pennington* doctrine does not foreclose plaintiff's reliance on the referrals for that purpose.  *See*

8   *Arizona Students' Ass'n v. Arizona Bd. of Regents,* 824 F.3d 858, 869 (9th Cir. 2016) ("Otherwise

9   lawful government action may nonetheless be unlawful if motivated by retaliation for having

10   engaged in activity protected under the First Amendment.") (quoting *O'Brien v. Welty*, 818 F.3d

11   920, 932 (9th Cir. 2016)).

12        Moreover, the fact that Rasmussen and Washko's enforcement actions may well

13   align with legitimate regulatory concerns does not by itself foreclose the possibility they acted

14   with some modicum of retaliatory intent.  *O'Brien*, 818 F.3d at 936 ("We have previously made it

15   clear that there is a right to be free from retaliation even if a non-retaliatory justification exists for

16   the defendants' action.").

17        Reviewing the record as a whole, plaintiffs present sufficient evidence, beyond

18   mere speculation, to raise a genuine question of material fact regarding the second prong of First

19   Amendment retaliation analysis as applied to Rasmussen and Washko.  *Contra Karam v. City of*

20   *Burbank*, 352 F.3d 1188, 1194 (9th Cir. 2003) ("[Plaintiff's] speculation as to [defendant's]

21   improper motive does not rise to the level of evidence sufficient to survive summary judgment.").

22        (b)    <u>Other County Defendants</u>

23        The same cannot be said, however, for the remaining County defendants.  In their

24   opposition to the County defendants' motion, plaintiffs focus almost exclusively on the conduct

25   of defendant Rasmussen, with limited reference to directions given by Washko to Rasmussen.

26   Opp'n to County MSJ at 11–14.  Plaintiffs make only scant argument regarding the actions of

27   other County defendants, with limited citation to evidence relating to any such actions.  This

28

1  dearth of argument, County defendants contend, is fatal to plaintiffs' claims related to those

2  remaining defendants.  County MSJ Reply at 6.

3           Defendants are correct.  Plaintiffs produce only the following undisputed evidence

4  in reference to remaining County defendants, presented here in chart form for ease of review:

| Defendant | Title | Supporting Evidence/Allegations |
|---|---|---|
| Jared Wickliff | Code Enforcement Supervising Officer | - Inspected property, issued violation notice.  Lull County Decl. ¶ 12<br>- Did not deliver notice to Lull or provide opportunity to appeal.  *Id.* ¶ 13.<br>- Wrote report summarizing findings, erroneously applied wrong building standard.  *Id.* ¶ 14. |
| Tammy Derby | Code Enforcement Manager | - Once he learned of NOPEAs Lull criticized Derby for use of what he considered unsanctioned NOPEA recordings against property title as coercion for County Development Standards.  *Id.* ¶¶ 24, 29.<br>- On February 1, 2014, used NOPEAs to coerce Lull into signing contract that augmented County legislation.  *Id.* ¶ 26.<br>- On September 16, 2014, made recommendation to revoke plaintiffs' business license.  *Id.* ¶ 32. |
| Paul Munoz | Code Enforcement Officer | - On March 3, 2014, Lull criticized Munoz for use of unsanctioned NOPEA recordings as coercion for County Development Standards.  *Id.* ¶ 29.<br>- On December 16, 2014, Munoz issued a $9,900 punitive sanction against Lull for failing to meet the Development Standards enumerated in the covenant.  *Id.* ¶ 36. |
| Leighann Moffitt | Director of the County Planning Services division | On September 16, 2014, Moffitt made recommendations to revoke plaintiffs' business license.  *Id.* ¶ 32. |
| Russ Williams | Principal Building Inspector | No allegations or evidence provided. |

19

| Bob Ivie | Supervising Building Inspector | No allegations or evidence provided. |
|---|---|---|
| John Muzinich | Building Inspector | No allegations or evidence provided. |
| Scott Purvis | Building Inspector | No allegations or evidence provided. |
| Wayne Eastman | Building Inspector | No allegations or evidence provided. |
| Lori Moss | Director of the Department of Community Development (oversees CE, BPI, and Planning) | On September 16, 2014, Moss made recommendations to revoke plaintiffs' business license. *Id.* ¶ 32. |
| June Powells-Mays | Supervising Deputy County Counsel (legal counsel to BPI and CE) | - On February 1, 2014, Powells-Mays used the recorded NOPEAs to coerce Lull into signing a contract [the Covenant] that "augmented" County legislation. *Id.*    ¶ 26.<br>- Lull criticized Powells-Mays for strong-arming him into signing the Covenant. *Id.*<br>- On September 16, 2014, Powells-Mays threatened Lull with disconnection of electrical service if he failed to comply with the Covenant. *Id.* ¶ 32.<br>- On September 16, 2014, Powells-Mays made recommendations to revoke plaintiffs' business license. *Id.*<br>- On December 23, 2014, Powells-Mays again threatened Lull with disconnection of electrical service if he failed to comply with the Covenant. *Id.* ¶ 38. |

Even when viewed in the light most favorable to plaintiffs, this evidence, to the extent plaintiffs provide any, fails to raise a triable question of fact regarding these defendants' intent to interfere with plaintiffs' First Amendment rights. Plaintiffs produce no evidence related to Russ Williams, Bob Ivie, John Muzinich, Scott Purvis and Wayne Eastman's involvement in the underlying events. Therefore, summary judgment is appropriately granted to those defendants. Fed. R. Civ. P. 56(a).

Plaintiffs also fail to explain how the evidence they point to of actions by defendants Wickliff, Moffitt, Derby and Munoz could support a reasonable juror's finding these

1    defendants had the intent to interfere with plaintiffs' First Amendment freedoms.  At best, an

2    inference can be drawn that these defendants used NOPEAs as a negotiation tool compelling Lull

3    to enter the covenant agreement; but, even if true, the evidence does not suggest, and no inference

4    can be drawn, that either of these actions were motivated, even tangentially, by plaintiffs'

5    exercise of free speech.  For example, plaintiffs claim Wickliff failed to provide proper notice and

6    an opportunity to appeal a January 5, 2011 code violation, but plaintiffs fail to explain how

7    Wickliff's failure to follow protocol was in response to plaintiffs' criticism, or even what specific

8    criticism pertained to Wickliff.  Lull County Decl. ¶¶ 12, 13.  The same is true for Leighann

9    Moffitt.  Plaintiffs claim she, along with Powells-Mays and Lori Moss, recommended plaintiffs'

10   business license be revoked, but they do not explain how this recommendation came in response

11   to specific criticism levied against Moffitt or her department.  *Id.* ¶ 32.

12           As for Derby and Munoz, plaintiffs do cite specific instances of their criticism of

13   them, *see id.* ¶¶ 24, 29 (January 29, 2014 criticism of Derby), ¶ 29 (March 3, 2014 criticism of

14   Derby and Munoz), and one instance in which Munoz imposed sanctions, *see id.* ¶ 36

15   (administrative penalties issued on December 16, 2014 for failure to comply with Covenant).  But

16   plaintiffs provide no argument or explanation connecting these instances to the termination of

17   their electrical service on December 24, 2014.  *See* Pls.' Opp'n to County MSJ (referencing

18   Derby and Munoz only in recitation of facts but providing no argument regarding their

19   involvement).  The evidence regarding each of these defendants—Wickliff, Moffitt, Derby and

20   Munoz—does not raise a disputed question of material fact as to whether a person of ordinary

21   firmness would refrain from engaging in the exercise of constitutionally protected speech as a

22   result of anything they did.  *Cf. Mendocino Envtl. Ctr.*, 192 F.3d at 1302–03 (enumerating

23   inferences to be drawn from appellees' circumstantial evidence in support of First Amendment

24   retaliation claim).

25           The same is true for Lori Moss.  Plaintiffs fail to produce evidence she was

26   personally involved in any of the underlying events or even aware of plaintiffs' criticisms, and

27   thus that she possessed the requisite intent to interfere with plaintiffs' First Amendment rights.

28   *See generally* Pls.' Opp'n to County MSJ.  Plaintiffs' only reference to Moss is contained in

1    Lull's declaration, where he states vaguely she was part of a team that "made recommendations to

2    revoke Autotek's business license."  Lull County Decl. ¶ 32.  However, plaintiffs also concede

3    Moss was the director of the department that oversaw CE, BPI and Planning, CUMF 67; she

4    never met with Lull, CUMF 68; and plaintiffs only sued Moss because she was the department

5    head and "her name was on the paperwork" as "the boss," CUMF 69.  While a supervisory

6    official may be held liable in her individual capacity for (1) "her personal involvement in the

7    constitutional deprivation," or if there is "(2) a sufficient causal connection between the

8    supervisor's wrongful conduct and the constitutional violation," *Rodriguez v. Cty. of Los Angeles*,

9    891 F.3d 776, 798 (9th Cir. 2018) (quoting *Keates v. Koile*, 883 F.3d 1228, 1242–43 (9th Cir.

10   2018), plaintiffs here provide no credible evidence beyond the fact that Moss merely oversaw the

11   departments responsible for addressing plaintiffs' violations.  This is insufficient to raise a

12   material question of fact with respect to whether plaintiffs can meet the standard for supervisory

13   liability set forth in *Rodriguez*, 891 F.3d at 798, so as to raise a triable question of Moss's First

14   Amendment liability capable of surviving summary judgment.

15            Likewise, plaintiffs produce insufficient evidence to raise a triable issue as to

16   defendant Powells-Mays's intent to impede the exercise of plaintiffs' free speech rights.  County

17   defendants contend Powells-Mays' actions were undertaken as she merely executed her duties as

18   County Counsel, prompted by a referral from BPI.  County MSJ at 22; CUMF 35–37.  Rather

19   than "taking adverse action against Lull, Powells-Mays actually helped Lull to acquire the

20   Subject Property by drafting the Covenant, which Lull requested, reviewed, approved and

21   executed." *Id.*; CUMF 8–11, 13.  Despite Lull's failure to fulfill his obligations under the

22   covenant, and accruing additional subsequent violations, Powells-Mays did not seek redemption

23   of the performance bond Lull had posted until roughly a year after it was instituted.  *Id.*; CUMF

24   39, 41–52, 76.  Finally, County defendants argue that because BPI and CE had opened

25   enforcement actions, which still remain open, for the multiple violations levied against the

26   property, Powells-Mays' enforcement activities "were not a retaliatory response to speech, but a

27   lawful and proper response to Lull's continuing code violations." *Id.*; CUMF 6, 63.  Plaintiffs

28   provide no argument in response.  *See generally* Opp'n to County MSJ; County MSJ Reply at 6.

1    This undisputed evidence of Powells-Mays's conduct, *see* CUMF 6, 8–11, 13, 35–

2   37, 39, 41–52, 63, 76, does not suggest she harbored retaliatory animus against plaintiffs.  In fact,

3   it suggests the opposite: She simply carried out her duties as County Counsel while attempting to

4   facilitate a reasonable resolution of the pending violations.  Plaintiffs' failure to proffer any

5   relevant evidence and argument to the contrary warrants granting summary judgment here as

6   well.

7                    iv.    Conclusion re County Defendants' Intent and First

8                           Amendment

9           To summarize, County defendants fail to show that no genuine question of fact

10   exists under the second prong of First Amendment retaliation analysis as to defendants

11   Rasmussen and Washko; however, they produce sufficient evidence to show there is no genuine

12   dispute regarding retaliatory intent as to all remaining County defendants.

13                    d)    First Amendment Causation

14          Generally, the test for causation in the First Amendment context stems from the

15   Supreme Court's decision in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274

16   (1977).  The "*Mt. Healthy* mixed-motive analysis[,] applies to First Amendment claims,

17   regardless of whether the plaintiff uses direct or circumstantial evidence to prove that there was a

18   retaliatory motive behind the adverse [] action."  *Allen v. Iranon*, 283 F.3d 1070, 1075 (9th Cir.

19   2002).  Under the *Mt. Healthy* "mixed-motive" analysis, as it is commonly known, if a plaintiff

20   presents sufficient evidence to satisfy all three prongs of the First Amendment retaliation

21   analysis, reviewed above, "then the burden shifts to the defendant to show by a preponderance of

22   the evidence that it would have reached the same decision . . . even in the absence of the

23   [plaintiff's] protected conduct."  *Lakeside-Scott v. Multnomah Cty.*, 556 F.3d 797, 803 (9th Cir.

24   2009) (quotations omitted) (alterations in original).

25          The court employs the *Mt. Healthy* analysis in evaluating the third prong of the

26   First Amendment retaliation test, which turns on the question of causation.  *See Lakeside-Scott*,

27   556 F.3d at 803 (considering *Mt. Healthy* under rubric of causation); *see also Nieves v. Bartlett*,

28   139 S. Ct. 1715, 1722 (2019) ("It is not enough to show that an official acted with a retaliatory

1   motive and that the plaintiff was injured—the motive must *cause* the injury." (emphasis in

2   original)).

3          At its core, the *Mt. Healthy* analysis is a question of "but-for causation," which is

4   "purely a question of fact" best left for the trier of fact. *Robinson v. York*, 566 F.3d 817, 825 (9th

5   Cir. 2009). "*Mt. Healthy* indicates the 'trier-of-fact' should determine whether the [adverse

6   action] would have occurred without the protected conduct." *Wagle v. Murray*, 560 F.2d 401,

7   403 (9th Cir. 1977) (per curiam).

8          Here, as discussed above, plaintiffs present sufficient evidence to raise a question

9   whether the conduct of Rasmussen and Washko was a substantial factor in the restraint of

10   plaintiffs' First Amendment rights. Rasmussen testified that Washko directed him to use the

11   language "imminent health and safety hazard" when noticing the violation and that he could not

12   recall another circumstance where he used that terminology under similar circumstances.

13   Rasmussen Dep. at 92:8–23; 94:2–24. Nor could he recall other circumstances where

14   unpermitted work warranted disconnection of power. Rasmussen Dep. at 103:7–10.

15   Rasmussen's testimony that the violation presented an imminent safety hazard is contradicted by

16   the testimony of plaintiff's engineer, Craig Rowland, that "there wasn't any unsafe condition" and

17   there was "no reason to ever cut the power off to th[e] building." Rowland Dep. at 71:13–19.

18   And, in a December 18, 2014 email from an OJ Platt, Platt conveyed the content of a phone call

19   in which Rasmussen claimed "Mr. Lull 'has gone off the reservation[]'" and that he intended to

20   cut power to Lull's property to get his attention. Lull County Decl. ¶ 37, Ex. A.

21          Under the *Mt. Healthy* burden shifting scheme, once the burden shifts to

22   defendants as it has here, the critical question is whether Rasmussen and Washko would have

23   acted the same way regardless of plaintiffs' protected speech. When considering the evidence in

24   the light most favorable to plaintiffs as required, the court cannot conclude there is no genuine

25   issue of material fact for a jury to decide. There is weight to County defendants' contention that

26   an enforcement action would have occurred regardless of plaintiffs' speech, given the history of

27   violations Lull amassed. *See* County MSJ at 14. Still, navigating the murky waters of causation

28   is a feat best left to the trier of fact. *Robinson*, 566 F.3d at 825. This is particularly so where, as

24

1   here, there is a lengthy, convoluted timeline of events, some quite close in time, comprising the

2   claimed constitutionally-protected activity and the alleged retaliatory actions.  *See Coszalter v.*

3   *City of Salem,* 320 F.3d 968, 977 (9th Cir. 2003) (listing proximity in time as one factor to be

4   considered when evaluating retaliatory motive in context of First Amendment retaliation claim);

5   *Fannin v. Smith*, No. 4:14-CV-5091-TOR, 2015 WL 1885683, at *7 (E.D. Wash. Apr. 24, 2015)

6   (in First Amendment retaliation claim, "[t]iming is but one factor that must be examined in the

7   totality of the circumstances in evaluating a motion for summary judgment").

8           As to the remaining County defendants, having found above no genuine question

9   of fact respecting the intent prong, the court need not reach the question of causation as to them.

10   *Cf. Hurd v. Garcia*, 454 F. Supp. 2d 1032, 1050 (S.D. Cal. 2006) (in prisoner civil rights case,

11   entering summary judgment on plaintiff's First Amendment retaliation claim because "[w]ithout

12   evidence of all five elements, Plaintiff cannot succeed in establishing a viable claim of First

13   Amendment retaliation" (quotation omitted)).

14           Taking into account the third causation prong, a jury question of material fact

15   remains regarding whether Rasmussen and Washko's alleged retaliatory motive caused plaintiffs'

16   injury.  Therefore, the County defendants are not entitled to summary judgment on this claim to

17   the extent plaintiffs bring it against Rasmussen and Washko.

18                          e)      Probable Cause

19           Finally, County defendants maintain that because actions by CE officers are

20   prosecutorial in nature, the heightened standard set forth in *Hartman v. Moore*, requiring a lack of

21   probable cause for an enforcement action, applies here.  547 U.S. at 265–66; County MSJ at 12;

22   County MSJ Reply at 3.  Plaintiffs appear to concede that *Hartman* applies.  Opp'n to County

23   MSJ at 8 (quoting *Hartman*, 547 U.S. at 260–61 ("The Plaintiff in a retaliatory-prosecution claim

24   . . . .")).  Determining the essential elements of a cause of action is for the court to decide as a

25   matter of law, however; the court need not accept a stipulation or concession.  *United States v.*

26   *John J. Felin & Co.*, 334 U.S. 624, 640 (1948); *Sinicropi v. Milone*, 915 F.2d 66, 68 (2d Cir.

27   1990) ("A court . . . is not bound to accept stipulations regarding questions of law[.]").  Here, the

28   court finds *Hartman* does not apply, as explained below.

                                       25

When considering the application of *Hartman's* heightened standard, the threshold question is whether the conduct at issue is indeed prosecutorial.  On this point, County defendants provide only a bare assertion, which is little help.  *See* County MSJ at 14 ("Because Code Enforcement's actions are a type of prosecution, *Hartman* is the more appropriate standard to apply to this fact pattern."); County MSJ Reply at 3 ("Plaintiffs agree that the First Amendment retaliation standard to be applied in this case is the *Hartman* standard for retaliatory prosecution.").  In *VNT Prop. 1, LLC v. City of Buena Park*, No. SA CV 15-0007-DOC (RNBx), 2015 WL 12762257, at *5 (C.D. Cal. Aug. 11, 2015), the district court discussed what kind of "prosecutorial duties" qualify for prosecutorial immunity.  The discussion is instructive:

> Prosecutorial immunity applies to state prosecutors when they are acting pursuant to their official role as advocate for the state performing functions "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). Prosecutorial immunity also applies to prosecutorial duties performed in the role as "advocate for the State" and involves "actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Id.* at 431 n.33. Prosecutorial immunity, however, does not extend to actions of a prosecutor which are "administrative" or "investigative" in nature. *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009). "Absolute immunity is designed to free the judicial process from the harassment and intimidation associated with litigation. That concern therefore justifies absolute prosecutorial immunity only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct." *Burns v. Reed*, 500 U.S. 478, 494 (1991) (citations omitted).

*Id.*  Applying this standard, the court in *Buena Park* found the City Prosecutor and the municipal law firm employed by the City were immune from suit because their conduct of "red-tagging" the subject property for code violations "fell within their prosecution of the City's enforcement action against Plaintiffs," and thus their actions were "'intimately associated with the judicial phase' of the proceedings[.]'"  Defendants in *Buena Park* then asked the court to extend immunity to the various city officials responsible for enforcing the municipal code.  *Id.* at *6.  The court declined, finding "no ground to extend absolute immunity to individual Defendants . . . who are the Director of Community Development, Chief Building Official, Senior Planner, Senior Building Inspector, and Code Enforcement Supervisor, respectively."  *Id.* at *6.

Immunity can also extend to actors who serve quasi-judicial or quasi-prosecutorial functions by playing an integral part in the judicial process.  *See, e.g.*, *Meyers v. Contra Costa Cty. Dep't of Soc. Servs.*, 812 F.2d 1154, 1158 (9th Cir. 1987) (social workers initiating and pursuing child dependency proceedings entitled to absolute immunity); *Briscoe v. LaHue*, 460 U.S. 325, 345 (1983) (applying absolute immunity to witnesses testifying at trial); *Sellars v. Procunier*, 641 F.2d 1295, 1303 (9th Cir. 1981) (finding absolute immunity applies to parole board officials considering whether to grant, deny or revoke parole); *Burkes v. Callion*, 433 F.2d 318, 319 (9th Cir. 1970) (probation officers and court-appointed psychiatrists serve a quasi-judicial function and are thus entitled to absolute immunity).

As legal concepts, prosecutorial immunity, quasi-judicial immunity and retaliatory prosecution are distinct; but, on a fundamental level, the conduct they cover shares a common attribute qualifying that conduct as "prosecutorial": enforcement through judicial proceedings. *See Skoog v. Cty. of Clackamas*, 469 F.3d 1221, 1234 (9th Cir. 2006) ("Retaliatory prosecution claims are really 'for successful retaliatory *inducement* to prosecute' because they can only be maintained against officials, such as investigators, who may persuade prosecutors to act." (emphasis in original) (citing *Hartman*, 547 U.S. at 260–62)).  To be considered "prosecutorial in nature," the conduct of a public employee, no matter the employee's function, must be so closely bound to the judicial enforcement process that it is essential to the initiation of that process to begin with.

Here, as in *Buena Park*, the County defendants do not explain why or how the conduct of the CE officers played such an integral role in the judicial process that the court must treat their actions as inherently "prosecutorial."  Indeed, apart from reference to the role of Powells-Mays as County prosecutor, County MSJ at 24, neither party suggests judicial proceedings, criminal or otherwise, loomed, let alone that the CE officers were essential to the initiation or preparation of those proceedings.  Even if the threat of criminal or enforcement proceedings could be inferred, County defendants' failure to connect the actions of CE officers to any impending or threatened prosecution is fatal to their position.

1        Because the CE officers' conduct is not inherently prosecutorial, as a matter of

2  law *Hartman's* heighted standard does not apply, and plaintiffs need not show the County

3  defendants acted in the absence of probable cause to ultimately prevail on their First Amendment

4  retaliation claim.  For the reasons stated above, plaintiffs' First Amendment retaliation claim

5  survives.

6                  f)     <u>Prosecutorial Immunity – June Powells-Mays</u>

7        Because plaintiffs fail to raise a triable question of fact as to any animus harbored

8  by County Counsel Powells-Mays, and thus fail to support their retaliation claim against her, the

9  court need not address the applicability of prosecutorial immunity here to the extent her conduct

10  qualified as that of a County prosecutor.  In any event, plaintiffs fail to respond to County

11  defendants' argument for the application of prosecutorial immunity; therefore, any opposition on

12  this score is waived.  *Sykes v. Dudas*, 573 F. Supp. 2d 191, 202 (D.D.C. 2008) ("[W]hen a party

13  responds to some but not all arguments raised on a Motion for Summary Judgment, a court may

14  fairly view the unacknowledged arguments as conceded.").

15                  g)     <u>Qualified Immunity</u>

16        Because plaintiffs raise a triable question of fact regarding the allegedly

17  unconstitutional conduct of CE officers Rasmussen and Washko, the court determines whether

18  plaintiffs' First Amendment claim survives under the doctrine of qualified immunity.

19        "The doctrine of qualified immunity protects government officials 'from liability

20  for civil damages insofar as their conduct does not violate clearly established statutory or

21  constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*,

22  555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In *Saucier*

23  *v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court articulated the well-known two-step

24  process for qualified immunity analysis:

25              First, a court must decide whether the facts that a plaintiff has alleged
                  or shown make out a violation of a constitutional right. Second, if the

26

27  /////

28  /////

1
2

> plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.

3 *Pearson*, 555 U.S. at 232 (citations omitted) (quoting *Saucier*, 533 U.S. at 201). The order of this

4 two-step operation is not mandatory, as the court may exercise its "sound discretion in deciding

5 which of the two prongs of the qualified immunity analysis should be addressed first in light of

6 the circumstances in the particular case at hand." *Id.* at 236.

7 i.    <u>Violation of a Constitutional Right</u>

8 Exercising its discretion, the court has followed the order of analysis articulated in

9 *Saucier* and first asked whether plaintiffs have made out a violation of a constitutional right. The

10 court has found plaintiffs have raised a triable question of fact as to officers Rasmussen and

11 Washko's involvement in the termination of plaintiffs' electrical service, and their violation of

12 plaintiffs' right to freedom of speech under the First Amendment. Plaintiffs thus have satisfied

13 the first step of the qualified immunity analysis.

14 ii.    <u>Clearly Established</u>

15 Turning to the second step, the court must determine whether "the right at issue

16 was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 232 (quoting

17 *Saucier*, 533 U.S. at 201). Recently, in *Capp v. Cty. of San Diego*, 940 F.3d 1046, 1058 (9th Cir.

18 2019), the Ninth Circuit reiterated the "clearly established" standard in the context of considering

19 a First Amendment retaliation claim:

20
21
22
23
24
25
26
27
28

> "[F]or a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate," though there need not be "a case directly on point." *Kisela v. Hughes*, __ U.S. __, 138 S. Ct. 1148, 1152, 200 L.Ed.2d 449 (2018) (per curiam) (quoting *White v. Pauly*, __ U.S. __, 137 S. Ct. 548, 551, 196 L.Ed.2d 463 (2017) (per curiam)); *see also White*, 137 S. Ct. at 552 ("Today, it is again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); *Reese v. County of Sacramento*, 888 F.3d 1030, 1038–39 (9th Cir. 2018) (noting that while we "do not demand a case with 'materially similar' factual circumstances or even facts closely analogous to [plaintiff's] case," existing caselaw must "demonstrate that the contours of [the] right were sufficiently clear such that 'any reasonable official in [his] shoes would have understood that he was violating it' " (third alteration in original) (first quoting *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002);

29

1    and then quoting *City and County of San Francisco v. Sheehan*, __
2    U.S. __, 135 S. Ct. 1765, 1774, 191 L.Ed.2d 856 (2015))).

3    *Id.* at 1058 (alterations in original).

4    In a § 1983 action, plaintiffs bear the burden of showing defendants violated their

5    clearly established rights.  *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991); *see also*

6    *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000) ("Once the defense of qualified immunity

7    is raised by the defendant, the plaintiff bears the burden of showing that the rights allegedly

8    violated were 'clearly established.'" (citation omitted)).  "If that burden is satisfied, the defendant

9    must prove that his conduct was 'reasonable.'"  *LSO, Ltd.*, 205 F.3d at 1157.

10   County defendants invoke qualified immunity and argue that plaintiffs fail to

11   identify clearly established law "that would have put the Code Enforcement defendants on fair

12   notice that they could not cite the Subject Property for Zoning Code violations, enforce the

13   citations, and decline to modify the Covenant under the circumstances."  County MSJ at 16.

14   Assuming without deciding that the County defendants properly define the factual scenario to be

15   assessed against the clearly established law, plaintiffs provide no argument in response and so

16   effectively concede the point.  *See generally* Opp'n to County MSJ; *see also* County MSJ Reply

17   at 2 (identifying plaintiffs' failure to oppose qualified immunity); *see also Shakur v. Schriro*, 514

18   F.3d 878, 892 (9th Cir.2008) (holding that plaintiff: "abandoned . . . claims by not raising them in

19   opposition to [the defendant's] motion for summary judgment." (alterations in original)); *Denial*

20   *v. City of Flagstaff*, No. CV-18-08067-PCT-DWL, 2018 WL 6566875, at *4 (D. Ariz. Dec. 13,

21   2018) (granting qualified immunity where plaintiff "apparently concede[d] officer did not violate

22   a "clearly established" right).

23   Officers Rasmussen and Washko are entitled to qualified immunity on plaintiffs'

24   first amendment retaliation claim.

25   h)    Municipal Liability - County of Sacramento

26   With respect to plaintiffs' claims against the County of Sacramento, plaintiffs also

27   present no evidence to support a finding of liability against the County.  While the County still

28   carries the initial burden on summary judgment, plaintiffs' omission simplifies the court's

1   decision if that burden is satisfied.  *Martinez v. Stanford*, 323 F.3d 1178, 1182 (9th Cir. 2003) ("A

2   district court may not grant a motion for summary judgment simply because the nonmoving party

3   does not file opposing material.").  Here, County defendants have met their burden, as described

4   below.

5            "A municipality cannot be held liable solely because it employs a tortfeasor—or,

6   in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior*

7   theory."  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).  Liability

8   under *Monell* is established if plaintiffs can prove: "(1) they were deprived of their constitutional

9   rights by defendants and their employees acting under color of state law; (2) that the defendants

10  have customs or policies which amount to deliberate indifference to their constitutional rights;

11  and (3) that these policies are the moving force behind the constitutional violation[s]."  *Palmer v.*

12  *Alameda Cty.*, No. 19-CV-03673-TSH, 2019 WL 5626633, at *2 (N.D. Cal. Oct. 31, 2019)

13  (quotations omitted) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 681-82 (9th Cir. 2001);

14  *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)).  "[W]here the policy relied upon

15  is not itself unconstitutional, considerably more proof than the single incident will be necessary in

16  every case to establish both the requisite fault on the part of the municipality."  *City of Oklahoma*

17  *City v. Tuttle*, 471 U.S. 808, 824 (1985).

18           County defendants present information supporting the conclusion their personnel

19  acted within the authority conferred by their positions and in accordance with the applicable law.

20  *See* County MSJ Reply at 4 (County may record NOPEA in accordance with Cal. Health &

21  Safety Code § 17985); *id.* at 5 (Cal. Building Code 105.2.1 requires permit within next working

22  day after conducting emergency repairs); *id.* (Sacramento County Code 16.02.080 § 109.4 allows

23  pre-permit work only upon a showing of impracticality); *see also* CUMF 20, 22 (Sacramento

24  County Superior Court upholding violations and administrative penalties against plaintiffs).

25  Plaintiffs present nothing to support a different conclusion, that any of the County defendants

26  acted under an unconstitutional County policy or according to an unconstitutional practice.  *See*

27  *generally* Pls.' Opp'n to County MSJ.  Rather, as County defendants note, plaintiffs appear to

28  concede County policies and practices were not the source of deliberate indifference in that they

1    contend "the County and Rasmussen deviated from their typical procedures in responding to

2    Plaintiffs . . . ."  County MSJ Reply at 6 (citing Opp'n to County MSJ at 20–21).  Given

3    plaintiffs' concession, the court need not consider whether any County policy or practice was the

4    moving force behind a constitutional violation.  Plaintiffs fail to withstand summary judgment of

5    their *Monell* claim.

6                                  i)      Conclusion

7           In sum, County defendants are entitled to summary judgment because there is no

8    genuine question of material fact regarding these defendants' involvement in the alleged

9    retaliatory actions, save for Rasmussen and Washko.  Rasmussen and Washko are, however,

10   entitled to qualified immunity because plaintiffs fail to show they violated clearly established law.

11   Moreover, no genuine question of fact exists with respect to plaintiffs' municipal liability claim.

12   For these reasons, County defendants' motion for summary judgment is GRANTED in full.

13                  3.      SMUD's Motion for Summary Judgment

14          SMUD also moves for summary judgment on the lone claim against it:  Violation

15   of procedural due process under § 1983.  A viable procedural due process claim requires that

16   plaintiffs show the government entity (1) deprived them of a vested liberty or property interest

17   (2) without adequate procedural protection.  *Brewster v. Bd. of Ed. of Lynwood Unified Sch. Dist.*,

18   149 F.3d 971, 982 (9th Cir. 1998).

19                          a)      Deprivation of Vested Property Interest

20          In the context of provision of electrical services, a vested right exists if plaintiff

21   can establish a "legitimate claim" to continued electricity.  *Memphis Light, Gas and Water Div. v.*

22   *Craft*, 436 U.S. 1, 11-12 (1978).  As the court explained in its order dismissing portions of the

23   second amended complaint, the "extent, scope and conditions of [that] right . . . are created and

24   defined by state and local rules, and those same rules therefore delineate when one has a claim of

25   entitlement to continued service."  *See* Second Dismissal Order (citing *Memphis Light*, 436 U.S.

26   at 11–12; *Parks v. Watson*, 716 F.2d 646, 656 (9th Cir. 1983)).  But "[w]here a state or local law

27   restricts the ability of a municipal utility provider to terminate service, customers of the provider

28   have a protected property interest in the continuation of service."  *Heuser v. Johnson*, 189 F.

1   Supp. 2d 1250, 1267 (D.N.M. 2001) (citing *Memphis Light*, 436 at 11–12); *Perez v. City of San*

2   *Bruno*, 27 Cal. 3d 875, 894 (1980) ("California law does not permit the termination of utility

3   service to a customer without good cause . . . ."); *cf. Myers v. City of Alcoa*, 752 F.2d 196, 198

4   (6th Cir. 1985) ("[L]ike [] employees . . . who had an expectation of continued employment (and

5   thus a property right) because they could not be terminated except 'for cause,' a recipient of

6   electrical service in Tennessee has a property right in the continuation of electric service because

7   it cannot be terminated except 'for good and sufficient cause.'").  In other words, where laws are

8   in place that prohibit a utility provider from disconnecting service at-will, a utility customer has a

9   vested property right in continued electrical service.

10          Here, although the parties disagree as to which regulation controls, whether

11  Sacramento County Building Code section 16.02.080[7] or California Public Utilities Code section

12  394.4, they do not dispute there are procedural protections in place that limit SMUD's ability to

13  terminate plaintiffs' service.  Sacramento Building Code section 16.02.080, subsection 112.3,

14  authorizes the Building Official, or an authorized agent, to terminate power if the building owner

15  or occupant "knowingly fails to comply with a notice or order," or in an emergency where it is

16  "necessary to eliminate an immediate hazard to life or property."  Public Utility Code section

17  394.4 permits disconnection by a publicly owned electric utility, such as SMUD, "only in

18  accordance with protocols established by the governing board of the local publicly owned electric

19  utility."  Cal. Pub. Util. Code § 394.4(b).  Because both codes establish conditions for when

20  electrical service may be terminated, i.e., termination only for cause, as a matter of law plaintiffs

21  have a vested property interest in the continuation of their electrical service.  *Cf. Field v. La Paz*

22  *Cty.*, No. CV-03-2214-PHX-SRB, 2006 WL 8440645, at *11 (D. Ariz. Apr. 27, 2006) (examining

23  Arizona law governing public service corporations, concluding that "[b]ecause [] these rules

---

24

25          [7] The court takes judicial notice of Sacramento Building Code section 16.02.080 (located
at http://qcode.us/codes/sacramentocounty/view.php?topic=16-16_02-16_02_080&frames=on) as

26  a publicly available document whose authenticity cannot reasonably be questioned.  *See* SMUD's
Req. for Jud. Not., ECF No. 73-3; *see also Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp.

27  3d 1011, 1033 (C.D. Cal. 2015) ("[P]ublic records and government documents available from
reliable sources on the Internet, such as websites run by governmental agencies" are frequently

28  subject to judicial notice).

1  concern[] the termination of electrical service . . . [plaintiff] has a property interest in the

2  continuation of his electrical service.").

3                      b)        Adequate Procedural Protection

4          Because plaintiffs have a vested interest in continued electrical service, "the

5  question remains what process is due." *Brewster*, 149 F.3d at 983 (quoting *Morrissey v. Brewer*,

6  408 U.S. 471, 481 (1972)).  A fundamental requirement of due process "'is notice reasonably

7  calculated, under all the circumstances, to apprise interested parties of the pendency of the action

8  and afford them an opportunity to present their objections.'" *Memphis Light*, 436 U.S. at 13

9  (quoting *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314 (1950)).  Still, what process is

10  due "is a function of context[]" because "due process 'is not a technical conception with a fixed

11  content unrelated to time, place and circumstances.'" *Id.* (quoting *Cafeteria & Restaurant*

12  *Workers Union v. McElroy*, 367 U.S. 886, 895 (1961)).

13          Ordinarily, to determine what procedural protection plaintiffs are entitled to, the

14  court must apply the three-part balancing test outlined in *Mathews v. Eldridge*, 424 U.S. 319

15  (1976).[8]  However, "It is well-settled that protection of the public interest can justify an

16  immediate seizure of property without a prior hearing." *Soranno's Gasco, Inc. v. Morgan*, 874

17  F.2d 1310, 1318 (9th Cir. 1989).

18          Here, plaintiffs allege SMUD did not provide adequate process because it failed to

19  abide by its own protocol. Opp'n to SMUD MSJ at 4–7.  As authorized by Public Utility Code

20  section 394.4, SMUD established Rule and Regulation 11 ("Rule 11"),[9] which sets forth a

21  protocol for when SMUD may disconnect service.  As pertinent here, Rule 11(I), (C) states:

22  /////

---

23        [8] Under *Mathews*, the court considers: "(1) 'the private interest that will be affected by the

24  official action"; (2) "the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards'; and (3) the

25  government's interest in minimizing the cost and burden of additional or substitute procedures." *Franceschi v. Yee*, 887 F.3d 927, 936–37 (9th Cir.) (quoting *Mathews*, 424 U.S. at 335), *cert.*

26  *denied*, 139 S. Ct. 648 (2018).

27        [9] The court also takes judicial notice of SMUD Rule and Regulation 11 as a publicly available document.  *See* Pls.' Req. Jud. Notice, ECF No. 75-5; *see also Gerritsen*, 112 F. Supp.

28  3d at 1033.

1

**I. Discontinuance of Service by SMUD**

2

SMUD may discontinue or refuse to establish or restore electric
service for any one or more of the reasons contained in this rule and
regulation. Except as otherwise specifically provided herein, seven
days written notice will be given before service is discontinued.

3

4

. . .

5

**C. Unsafe or Illegal Apparatus**

6

7

SMUD may discontinue or refuse service if any part of customer's
wiring or equipment, or use thereof, is either unsafe or in violation
of law, until such apparatus shall have been placed in a safe condition
or the violation remedied. If, in SMUD's judgment, operation of
customer's equipment constitutes a dangerous condition, SMUD
may discontinue service without notice.

8

9

10

11

Rule 11(I)(C), ECF No. 75-5, at 3.

12

The crux of plaintiffs' argument is that Rule 11 section I permits an exception to

13

the seven day notice period only where "specifically provided," and because Rule 11(I)(C)

14

contains no exception that allows SMUD to disconnect service "merely at the request of a public

15

entity such as the County of Sacramento[,]" SMUD violated its own protocol, and plaintiffs' due

16

process rights, by disconnecting plaintiffs' service without notice.  Opp'n to SMUD MSJ at 6–7.

17

SMUD asserts that Rule 11(I)(C) grants its authorized agents broad discretion to

18

terminate service immediately upon judging a property unsafe.  SMUD MSJ at 9.  It is common

19

practice, SMUD contends, that its agents rely on and often defer to public agencies when

20

determining a property to be unsafe and subject to service termination without notice.  *Id.* at 10

21

(citing SMUF ¶¶ 5, 7–9).  SMUD argues that when Mike Wolff, a SMUD Revenue Protection

22

Representative authorized to disconnect service, received word from BPI employee Rasmussen

23

that plaintiffs' property had been deemed unsafe for occupancy due to numerous code violations,

24

as evidenced by a notice posted on the property, Wolff determined the property to be dangerous

25

such that service must be terminated.  *Id.*

26

For evidentiary support, SMUD provides the declaration of Wolff, who has been

27

personally involved in 50 to 100 service disconnection requests initiated by city or county public

28

1    health and safety agencies.  Wolff Decl. ¶ 2.[10]  Wolff states, under penalty of perjury, that SMUD

2    does not make independent determinations of code compliance or public safety before complying

3    with termination requests from public health and safety agencies, nor does it second guess these

4    determinations because its "personnel lack expertise to determine code compliance and safety

5    issues on their own . . . ."  *Id.*  ¶¶ 10–11.  "SMUD only assists the disconnection[] efforts of

6    public agencies having authority to disconnect power for public health and safety reasons."  *Id.*

7    ¶ 12.  Here, the County had the authority.  Wolff also says it is not SMUD's practice or protocol

8    to note when a determination of dangerousness has been made because it is implicit when a

9    public agency, with the authority to authorize termination, requests immediate termination.  *Id.* ¶

10   9.  Wolff followed these standard procedures when Rasmussen notified him of the circumstances

11   involving the subject property, posted the property as unsafe and authorized Wolff to terminate

12   service the morning of December 24, 2014.  *Id.* ¶¶ 3–8.

13            SMUD also provides additional evidence supporting certain key assertions in

14   Wolff's declaration.  *See* Declaration of Julio Colomba ("Colomba Decl."), ECF No. 70-5, Ex. C

15   (Lull deposition testifying that he observed property being posted as unsafe on day of

16   disconnection), Ex. D (notice to Lull of BPI authorization of service termination due to

17   continuing violation of Stop Work Order) & Ex. E (photographs of "UNSAFE" and

18   "VIOLATION" notices posted on the property on day of disconnection, December 24, 2014).

19            Plaintiffs provide scant evidence to rebut SMUD's.  They offer Lull's self-serving

20   declaration, which states merely his position that there were never "any dangerous condition[s] on

21   _____

22       [10]  Plaintiffs object to the admissibility of Wolff's declaration based on lack of foundation
     and personal knowledge. ECF No. 75-4. Rule 56(e) requires that proper foundation be

23   established before evidence can be considered on summary judgment. *Bias v. Moynihan*, 508
     F.3d 1212, 1224 (9th Cir. 2007).  A declaration supporting summary judgment "must be made on

24   personal knowledge, set out facts that would be admissible in evidence, and show that the . . .
     declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).  Wolff's

25   declaration explains his role as a Revenue Protection Representative at SMUD, his extensive
     history in service disconnections, his interaction with and personal understanding of SMUD rules

26   and policies that set forth disconnection procedures, and his personal involvement in the
     December 24, 2014 disconnection at issue here. *See generally* Wolff Decl.  These averments lay

27   sufficient foundation and establish Wolff's personal knowledge of the relevant facts.  Plaintiffs'
     objections are overruled.

28

1  the property" or that "no wiring, equipment or other electrical apparatus . . . was in an unsafe or

2  dangerous condition" at the time power was disconnected.  Lull SMUD Decl. ¶¶ 5–6.  Lull's

3  declaration does not outline any experience or training he has that would allow him to make an

4  accurate assessment of safety conditions at a commercial property, and so the court disregards it.

5  *See Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) ("[A] self-serving

6  declaration does not always create a genuine issue of material fact for summary judgment: The

7  district court can disregard a self-serving declaration that states only conclusions and not facts

8  that would be admissible evidence.").

9          Lull's declaration aside, plaintiffs provide additional evidence that only

10  undermines their attempt to defeat summary judgment.  Plaintiffs cite the deposition testimony of

11  a Daniel Miller to support their argument that SMUD routinely disconnects power based on

12  public safety determinations and termination requests by county agencies.  Opp'n to SMUD MSJ

13  at 2 (citing Deposition of Daniel Miller ("Miller Depo."), ECF No. 75-1).  But Miller also

14  testified that "[w]e are not the experts in building codes or knowing what structures are safe. . . .

15  So if [a county agency] deem[s] a building unsafe and want the power disconnected, then we

16  would oblige . . . ."  Miller Depo. at 16:3–8.  Miller's testimony confirms Wolff's declaration that

17  SMUD does not make independent code compliance or public safety determinations; it does not

18  contradict Rule 11(I)(C)'s provision that SMUD may terminate service without notice if, in its

19  "judgment, operation of [a] customer's equipment constitutes a dangerous condition[.]"  Plaintiffs

20  even concede "that SMUD personnel need not personally diagnose a dangerous condition before

21  disconnecting electrical service under the authority provided in the second sentence of SMUD

22  Rule 11-1-C."  SUMF 16.  Rule 11(I)(C) contains no limitation on the kind of information SMUD

23  may rely on in order to judge a property unsafe for continued service.  If it is SMUD's consistent

24  practice, as Wolff and Miller testify, to rely upon termination requests conveyed to SMUD by

25  county officials who have code compliance and public safety expertise and also possess the

26  authority to initiate such requests, the express language of Rule 11(I)(C) permits such a practice.

27  *Wards Cove Packing Corp. v. Nat'l Marine Fisheries Serv.*, 307 F.3d 1214, 1219 (9th Cir. 2002)

28  ("[T]he plain meaning of a regulation governs . . . ").  Even if SMUD could not prevail on

1   summary judgment by relying on Rule 11(I)(C), plaintiffs provide no evidence otherwise that

2   SMUD deprived them of the process to which they say they were entitled under the constitution.

3          Finally, assuming without deciding that SMUD qualifies as a municipal body

4   under 42 U.S.C. § 1983, and is thus subject to *Monell* considerations, a key element to

5   establishing municipal liability is that the policy or practice at issue must be the "moving force

6   behind the constitutional violation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)

7   (alteration and quotation omitted); *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir.

8   2008) ("In a § 1983 action . . . the plaintiff must establish both causation-in-fact and proximate

9   causation.").

10         Plaintiffs present no evidence to rebut SMUD's contention that even Rule 11(I)(C)

11  authorized SMUD's action, the rule was not the moving force behind the termination of plaintiffs'

12  electrical service.  As SMUD points out, County agencies, such as BPI and CE, possess full

13  authorization to terminate service when an occupant fails to comply with a notice or order or

14  where emergency conditions exist.  Sacramento Building Code § 16.02.080, subsection 112.3.  As

15  noted above, when County officials seek assistance in exercising this authority, it is SMUD's

16  practice to comply, as authorized by California Public Utility Code section 12802.[11]  SMUD

17  further contends that a failure to comply would be tantamount to imposing "superfluous

18  procedural safeguards that could only interfere with or countermand the lawful execution of these

19  other agencies' police powers."  SMUD MSJ at 8.

20         SMUD's narrative fits with what happened here, where it was the County that

21  initiated termination procedures, not SMUD.  Plaintiffs provide no evidence to the contrary, nor

22  do they present any evidence suggesting that if SMUD had complied with Rule 11 as plaintiffs

23  construe it, or Rule 11 were crafted differently, the County would not have succeeded in having

24  plaintiffs' electricity disconnected.

25  _____

26         [11] In pertinent part, Public Utility Code section 12802 states: "A [municipal utility] district
    may . . . cooperate with and accept cooperation from the State, or any department,

27  instrumentality, or agency thereof, or any public agency of the State in the construction,
    maintenance, and operation of . . . any such enterprise."  For purposes of section 12802, the

28  County operates as an arm of the state.

1          c)          Conclusion

2                    For these reasons, SMUD's motion for summary judgment is GRANTED in full.

3          C.          Plaintiffs' Motion to Amend

4                    Plaintiffs also move to file a third amended complaint ("TAC") to incorporate

5    claims the court abstained from hearing earlier under the *Pullman* abstention doctrine.  Pls.' Mot.

6    Am., ECF No. 69; First Dismissal Order at 7–13.  As the court previously explained, the four

7    then-pending state actions prompted it to abstain given the significant overlap with this federal

8    case in terms of substance and relief.  First Dismissal Order at 8.  The common questions across

9    all of these claims is the constitutionality of the County's enforcement procedures and plaintiffs'

10   ability to be heard in opposition.  Neither the resolution of state proceedings nor the court's order

11   here resolve these questions in plaintiffs' favor.  The four state matters were either decided in the

12   County's favor (case no. 34-2015-177665), dismissed for lack of jurisdiction (case no. 34-2015-

13   00182775), or voluntarily dismissed by plaintiffs (case nos. 34-2015-80002172, 34-2015-

14   80002233).  *See* County Opp'n to Mot. to Am. at 2–3; County Req. for Jud. Not., ECF No. 71-

15   1.[12]  The court's order here forecloses the possibility of liability against the County and its

16   individual officers based on either lack of disputed evidence of a constitutional deprivation or

17   qualified immunity.  The claims from which the court previously abstained have no bearing on

18   plaintiffs' claims against SMUD.  *See* Second Dismissal Order at 4 ("no pending state cases

19   pertain to SMUD").

20                    Moreover, the court finds amendment is not justified under Federal Rule of Civil

21   Procedure 16 or 15.  When a party moves to amend the complaint after the court has issued its

22   Rule 16 scheduling order, Rule 16(b)'s "good cause" standard first controls.  *Johnson v.*

23   *Mammoth Recreations, Inc.*, 975 F.2d 604, 608 (9th Cir. 1992).  Then, if "good cause" is shown,

24   proposed amendment is evaluated under Rule 15.  *Id.* (citing approvingly *Forstmann v. Culp*, 114

25   F.R.D. 83, 85 (M.D.N.C. 1987) ("[P]arty seeking to amend pleading after date specified in

26

27   ─────────────────────

          [12] The court takes judicial notice of Sacramento County Superior Court records for the
28   four state cases prompting its abstention.  *Harris*, 682 F.3d at 1132.

1  scheduling order must first show 'good cause' for amendment under Rule 16(b), then, if 'good

2  cause' be shown, the party must demonstrate that amendment was proper under Rule 15.")).

3          "Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party

4  seeking the amendment." *Id.* at 609.  The four state matters relevant here were resolved at

5  various times between April and May 2018.  *See generally* County Req. for Jud. Not.  Although

6  plaintiffs appealed the decision in Case No. 34-2015-177665, that appeal was later abandoned and

7  dismissed on September 25, 2018, for failure to prepare the appellate record.  *Id.* at 17.

8  Essentially, by May 2018 plaintiffs knew the fate of their state court matters, going through only

9  the initial motions to appeal one; yet they waited at least five months, until after all discovery

10  deadlines had passed, to seek amendment.  *See* Am. Sched. Order, ECF No. 56.  Waiting to seek

11  amendment until after abandoning an appeal does not amount to "good cause" under Rule 16(b).

12          Even if plaintiffs could satisfy Rule 16(b)'s "good cause" standard, amendment

13  would be futile under Rule 15.  Although courts generally should adhere to Rule 15's liberal

14  standard by "freely [granting leave to amend] when justice so requires," this adherence is not

15  required when amendment would be futile.  Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S.

16  178, 182 (1962).  Given the substantial overlap between the state matters and the claims here, it

17  would be futile to now incorporate claims finally decided or abandoned in state court.  The court

18  finds the County's argument persuasive, that resolution of state matters may either preclude

19  certain federal claims or render others incognizable.  *See* Opp'n to Mot. to Am. at 8–9 (citing

20  *Miller v. County of Santa Cruz*, 39 F.3d 1030, 1038 (9th Cir. 1994)); *see also* County Not. of

21  Suppl. Authority, ECF No. 89 (citing *Doe v. Regents of the Univ. of California*, 891 F.3d 1147,

22  1154-55 (9th Cir. 2018)).

23          Plaintiffs' motion to amend is DENIED.

24  III.    <u>CONCLUSION</u>

25          For the reasons discussed above, plaintiffs' motion for relief, ECF No. 68, is

26  DENIED; plaintiffs' motion to amend, ECF No. 69, is DENIED; County defendants' motion for

27  summary judgment, ECF No. 66, is GRANTED in full; and SMUD's motion for summary

28

judgment, ECF No. 70, is GRANTED in full.  The Clerk of Court is directed to enter judgment in favor of County defendants and SMUD and CLOSE this case accordingly.

          IT IS SO ORDERED.

DATED:  July 17, 2020.

                          CHIEF UNITED STATES DISTRICT JUDGE